Filed 12/9/13  In re Guillermo P. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re GUILLERMO P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GUILLERMO P.,<br><br>    Defendant and Appellant. | F066412<br><br>(Super. Ct. No. 12CEJ600440-1 )<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Gregory M. Chappel, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

.

---

[*]        Before Cornell, Acting P.J., Poochigian, J. and Franson, J.

-ooOoo-

This case comes to us pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *In re Kevin S.* (2003) 113 Cal.App.4th 97 (*Kevin S.*). Having reviewed the record as required by *Wende* and *Kevin S.*, we affirm the judgment.

We provide the following brief description of the facts and procedural history of the case. (See *People v. Kelly* (2006) 40 Cal.4th 106, 110, 124.)

On May 24, 2012, a juvenile wardship petition was filed alleging that Guillermo P., the minor, then age 12, came within the provisions of Welfare and Institutions Code section 602, subdivision (a), in that, on or about May 22, 2012, the minor violated Penal Code section 286, subdivision (c)(2), sodomy by use of force.

The incident at issue involved the minor and R.F., age 14, both students in middle school, during the early part of 2012. They were introduced to each other by R.F.'s younger sister. The two communicated with each other through Facebook and then considered themselves "boyfriend" and "girlfriend," which, according to the minor, meant that they spent time together during breaks at school. According to R.F., they "broke up" within 3 or 4 weeks because R.F.'s friends did not like the minor, although the minor wanted to continue the relationship.

While the two were "dating," the minor told R.F.'s younger sister several times that he wanted to "fuck" R.F. R.F. did not believe her sister, saying the minor would never do that. But R.F. also testified that the minor had told her he wanted to have sex with her at his house and R.F. would tell him "no."

Although R.F. had been angry with the minor prior to the incident in question because he had given her a necklace belonging to a previous girlfriend, she claimed not to be angry with him on May 22, 2012. On that day, while R.F. was still at home, she received a text message from the minor asking her to text message him once she got to school, which she did. R.F. arrived at school an hour early, met with the minor and they

2.

took a walk together. During the walk, the minor grabbed R.F.'s hand and pulled her toward an abandoned house, although she told him she did not want to go.

R.F. testified that the minor took her to the backside of the house, pulled his pants down, pushed her head down and put his penis into her mouth. But she did not tell anyone about orally copulating the minor after the incident because she was too embarrassed.

R.F. testified that the minor then kissed her and pulled down her pants. She pulled them back up, and he then pulled down both her pants and his own. The minor turned R.F. around and inserted his penis into her rectum. R.F. screamed, cried and told the minor to stop, but he continued. According to R.F., the minor did not wear a condom. Then, according to R.F., the minor stopped suddenly, both of them pulled up their pants, and R.F. walked back to school very quickly, while the minor walked behind her. During the incident, R.F. hit the minor a couple of times with a closed fist.

R.F. arrived at her first class, slightly late and crying. Her friend J.G. passed her a note asking what was wrong. R.F. wrote back that she had been raped. Later, during a break, R.F. told J.G. that the minor had taken her to an abandoned house and raped her. She had told him to stop, but he would not. Later, during lunch, R.F. also told her friends F.R. and L.V.

L.V. said that she, F.R., and another friend, B., confronted the minor regarding the incident and that he said he was "sorry" and "didn't mean to do it." According to F.R., a few of R.F.'s friends confronted the minor about the incident in front of his friends and they laughed about it. After the group talked to the minor, he approached R.F., grabbed her by the arms, pulled her close to him and asked, "Why are you saying our business to everyone?" In response, R.F. yelled at him, "When I say no, no means no." According to L.V., the minor walked up to R.F. and attempted to talk to her and that R.F. then told him that when she says "stop" it means to stop and "no means no." F.R. and B. then reported the incident to a teacher.

3.

Following an investigation by the police at the school, R.F. was taken for a forensic exam. The minor was placed in custody and also taken for a forensic exam. Blood and urine samples were collected from the minor, as well as swabs from his penis and scrotal areas and the cheek of his mouth. The minor's clothing was retained.

During the forensic examination done on R.F., she reported pain in her anal area and described the incident with the minor in the abandoned house. A sample of what could be body fluids was taken from R.F.'s neck, because R.F. told the nurse the minor kissed her and tried to bite her neck. A hair sample and a swab from R.F.'s anal area were collected. The examiner noticed two small flesh colored bumps with some area of pink around the bumps in R.F.'s anal area, which could be caused by penetration, straining or constipation. No vaginal exam was performed because R.F. denied any sexual activity prior to the incident and she denied that oral copulation took place.

At the hearing on the incident, the parties stipulated that the various samples, photographs and other information collected from R.F. and the minor were transported to and held at the police department.

A senior criminalist with the Department of Justice who performed the tests on both R.F.'s and the minor's samples testified to the results. He found sperm heads on both R.F.'s rectal swab and panties. He found elevated levels of saliva and epithelial cells from the mouth on R.F.'s neck swab.

The criminalist also found epithelial cells on the minor's penile and scrotal swabs and underwear, but did not find any fecal material on any of the samples. According to the criminalist, epithelial cells can come from the mouth, rectum, vagina, or urethral openings. The criminalist also opined that, in a case involving sodomy, he would expect to find some fecal stains or material on the alleged suspect or his clothing, but might not if the person used a condom.

Another senior criminalist with the Department of Justice performed DNA testing on R.F.'s rectal swab and panties, as well as the swabs taken from both the minor's and

4.

R.F.'s mouth. The criminalist concluded that the minor was a major DNA contributor to the mixtures found in the swabs and the likelihood that a person other than the minor could have been a contributor was extraordinarily remote.

A certified sexual assault nurse testified for the minor that R.F.'s clothing should have been collected as evidence and that a vaginal examination should have been performed regardless of statements made by the victim. She opined that, if there had been forced penetration of the rectal area, some tears, scratches or redness of the area would normally be expected. She also opined that, except for the two small bumps, there was no other swelling of the area which she thought was unusual.

The minor testified in his own behalf that, before arriving at school, R.F. sent him a text message to bring a condom. After meeting R.F. at school, they walked through the nearby alley at her suggestion. The minor testified that, as on previous occasions, the two of them cut through the yard of the abandoned house to go to a nearby liquor store to buy candy and chips, but this time stayed in the abandoned yard to kiss. R.F. then suggested they have sex, so she pulled down his pants and put her mouth on his penis. The minor then gave R.F. the condom, which she put on him, pulled her pants down, turned around and he inserted his penis into her vagina. While doing this, the minor claimed his penis "accidentally slipped out and accidentally went into her anus." R.F. then told him to stop, which he did, and they left the yard. According to the minor, R.F. was neither crying nor did she hit him.

The minor testified that, while they walked back to school, he gave R.F. his phone and she deleted his text messages. During lunch recess, he saw R.F. crying and when he approached her, she ignored him. R.F.'s friend then approached him and accused him of making R.F. cry.

After being brought to the principal's office, the minor was questioned by police. He denied anything had happened with R.F. because he was scared. The minor testified that officers told him R.F. accused him of rape, that he had hurt her, and that she was at

5.

the hospital. The officers told him to "write a letter" to R.F., which he did. According to the minor, R.F. was not doing anything she did not want to do and that during the incident, when she told him to stop, he did.

In rebuttal, a sex crimes investigator who interviewed the minor testified that the minor initially denied having any sexual contact with R.F., but then changed his story to acknowledge that they did have sex in the backyard of the vacant home. According to the detective, the minor made various statements: that R.F. was screaming during the incident for approximately one minute; that she screamed when he first penetrated her; that she screamed for between one minute and 30 seconds; that sex lasted five minutes; and that sex lasted less than 30 seconds.

The investigator testified that the minor denied raping anyone and seemed genuinely sorry for what he had done. The investigator acknowledged that he was aware that R.F. and the minor had sent text messages to each other and that each accused the other of first suggesting they have sex. But, the investigator felt there was no need to look at the text messages because the minor eventually admitted they had had sex. In response to a question by the judge, the detective said he would have looked at the text messages if the minor had told him that R.F. had sent him a text message to bring a condom, but merely a simple request to meet did not warrant looking at the text messages.

Following the jurisdictional hearing, the court found the allegations of the petition true beyond a reasonable doubt.

At disposition, the court adjudged the minor a ward of the court and ordered him to remain under the supervision of the probation department until further order of the court subject to certain conditions set forth by the court. The court temporarily removed the minor from the custody of his parents and placed him in the custody of the juvenile justice campus for 180 days. The minor was given credit for 178 days already served in confinement, to be credited against the maximum period of confinement of eight years.

6.

The minor was ordered to provide specimens and palm prints pursuant to Penal Code sections 295 and 296; to submit to testing pursuant to Penal Code section 1202.1; to pay a restitution fine in the amount of $100 pursuant to Welfare and Institutions Code section 730.6; to not view, purchase or possess sexually explicit materials; not to own or have any dangerous or deadly weapons; to not consume any alcohol or use or possess any illegal drugs or substances; to submit to chemical testing; to subject himself to search and seizure at any time with or without a warrant; to attend psychological and substance abuse assessments, counseling and treatment as ordered by the probation officer; and to enroll in and complete the sex offender treatment program through the probation department.

The minor appealed. We appointed counsel to represent the minor on appeal. Counsel filed an opening brief that set forth the facts of the case and requested this court to review the record and determine whether there are any arguable issues on appeal. (*People v. Wende, supra,* 25 Cal.3d 436; *In re Kevin S., supra,* 113 Cal.App.4th 97.) The minor was advised by counsel of the right to file a supplemental brief within 30 days of the date of filing of the opening brief. More than 30 days have elapsed, and we have received no communication from the minor. Having undertaken an examination of the entire record, we find no arguable error that would result in a disposition more favorable to the minor.

## DISPOSITION

The dispositional order is affirmed.

7.